Argued March 18; affirmed March 30, 1948

# PETERSON *v.* WRIGHT

191 P. (2d) 645

*W. W. McKinney*, of Salem, argued the cause for appellants. With him on the brief was George A. Rhoten, of Salem.

*Bruce Spaulding* and *W. E. Keyes*, of Salem, argued the cause and filed a brief for respondent.

Before Rossman, Chief Justice, and Belt, Kelly, Bailey and Hay, Justices.

KELLY, J.

On the 21st day of February, 1946, plaintiffs consummated the purchase of the farm formerly owned by defendant upon which the dwelling house and walnut tree in suit were situated. Defendant by agreement with plaintiffs remained in possession of said dwelling house; and said walnut tree was in close proximity to the dwelling house.

On the 7th day of March, 1946, while defendant was occupying the dwelling house, a fire consumed it and badly damaged said walnut tree.

In plaintiffs' amended complaint it is alleged:

"That said defendant was careless and negligent in the care, control and possession of said dwelling house in the following particulars:

(1) Said defendant permitted paper and inflammable material to be piled near and adjacent to the ignited heating stove located in the house.

(2) Permitted and allowed fire to burn in said

heating stove when the same was unattended and at an hour late in the night.

(3) Used and operated a stove that was not safe in that the door or front opening thereof would not catch or lock so as to keep burning material from falling out on the floor.

(4) Placed wood and other ignited material in said stove in such a manner as to permit the same to fall against the door or opening and causing the same to open and allow ignited material to fall upon the premises adjacent to the stove.''

It is also alleged that the carelessness and negligence of said defendant was the proximate cause of said fire and the loss of said dwelling house and walnut tree.

Defendant in her answer to plaintiffs' amended complaint admitted that on March 7, 1946, defendant was in possession of the house in suit and on said day a fire occurred and destroyed it.

Defendant also admitted that at the time of the fire the walnut tree mentioned in the complaint was damaged by fire.

Issue was joined as to the value of said dwelling house and walnut tree.

All other allegations of plaintiffs' amended complaint were denied by defendant.

When plaintiffs rested their case, the learned trial judge sustained defendant's motion for involuntary nonsuit on the ground that there was no testimony tending to show that the negligence, if any, of defendant was the proximate cause of the destruction of the dwelling house or the damage to the walnut tree.

A review of the testimony upon which plaintiffs rely as sustaining their allegations of negligence and proximate cause is necessary in order to determine

whether error was committed in the trial of the case as contended by plaintiffs.

Mrs. Peterson, one of the plaintiffs, testified that, when plaintiffs were purchasing it, they went over the interior of the building rather thoroughly, and that there was a wood range in the kitchen and an old heater in the sitting room.

She was then asked: "Did you have an occasion to observe the heater?" To this she answered:

"Yes. One night when we went over, talking this sale over with her, it was at night, and she had a terrific fire in the heater because at that time she was drying walnuts in the sitting room. There were walnuts through the room in boxes and she had a terrific fire in this heater, and the door was slightly ajar. I don't know whether it was catched thoroughly or had not been, but there was a slight jar that you could see light from the edges of the stove."

It will be noted that the incident above recounted occurred while negotiations for the sale of the premises were pending. The sale was closed on February 21, 1946, the fire occurred on March 7, 1946, so that the above quoted testimony refers to a time at least two weeks prior to the fire.

Mrs. Barbara Bindel testified that in the fall of 1944, defendant told her that the stove was "broken and she had to have it fixed."

Upon being asked by the court if defendant ever told the witness that defendant had it fixed, the witness Mrs. Bindel answered: "No. I wasn't there since then."

Mr. H. W. Howard, who was employed by the State Police Department in the branch of that department that conducts the investigation of fires, testified that,

while investigating the fire in suit, he had occasion to talk with defendant.

We quote from the transcript of his testimony, with respect to the statements made to him by defendant, as follows:

"Q And where did you see her?

A I contacted her at the hotel in which she was stopping on the morning of March the 12th.

Q Was anyone with you?

A No, sir.

Q Did you talk with her at that time?

A I brought her to the district attorney's office in Dallas and talked with her en route here and at the district attorney's office.

Q Now, will you relate to the jury your conversation with Mrs. Wright with reference to the fire?

A She stated that the evening of the fire she had gone to bed about dark and was unable to sleep and gotten up about 11:00 p. m. She wrote two letters, one to her sister and to a lady friend who resided in Michigan and she had gotten up, there wasn't any fire in the heating stove and that she had built one, using paper and kindling and that the fire was still burning when she finished the letters about 1:00 a. m. and she retired, that she had gone to sleep and was awakened by her dog that always remained in the bedroom with her. The dog was licking her face and she awakened and the room was full of smoke; that she got up and dressed, put on her shoes and stockings and dressed and took a bathrobe and her purse that was under her pillow and went downstairs. Arriving downstairs, why, she attempted to get to the telephone but she said the telephone was in the vicinity of the heating stove and it was so smoky and intense heat in that part of the room that she was unable to get to the phone. She said she wasn't able to see any blaze but the fire seemed to be burning in

the partition between the living room and the dining room, or the dining room and the kitchen. She stated she then started carrying things from the house, and she carried out a box that she had packed and was on the davenport, and she carried out two or three suitcases that she had packed and were on the bed in the downstairs bedroom; that she also removed a coat and two dresses that were in the closet in the downstairs bedroom and that the last box she removed from the house was a box containing her silverware that was sitting just inside the front door. After removing that much of the property, she said she was no longer able to get back in the house and she went out on the highway and tried to stop a car and finally after three or four cars had passed, she finally succeeded in stopping a lady motorist who was driving towards Salem; that this lady in attempting to turn her car around and come back got her car stuck, but this lady motorist then went to the next house north of her place and summoned some help and she remained at the house until she came back. She also stated during the interrogation that she felt that she was responsible for the fire in a way because she had gotten up and built this fire in the heating stove and that there was considerable paper and magazines lying around the stove as she had been packing and cleaning up the house for several days and burning these papers but hadn't burned them all yet, and that it was possible that the door on the stove which wasn't in good repair had gotten open and some sparks had gotten out onto these papers.

Q That about concludes her statement to you?

A Well, in regards to the fire, yes. There was other conversation about the sale of the property and one thing and another but—

Q Now, did she say anything about her responsibility about the fire in addition to what you have stated?

A No, I think not.

Q And did she say anything about the insurance that she had on the house?

A She said that she had had the insurance on the buildings canceled as the Petersons didn't want that insurance. She had kept the insurance on her household goods.

Q Did she say anything about the amount that she had?

A I don't recall that she did. I knew the amount.

Q Did she say anything about offering to pay them the amount of the insurance?

A Well, she said that she felt responsible, that she felt —— ——

\* \* \* \* \* \* \* \* \* \*

A Yes, she stated that she believed that she should write her own check, for the amount of the insurance that she had had on the property and give it to Peterson.

Q (Mr. McKinney, continuing) Did she mention any amount?

A No, sir.

Q How many conversations did you have with Mrs. Wright?

A Just the one time.

Q Just the one day?

A Yes, sir.

Q That conversation that you have described took place at that place?

A Well, I contacted her at her hotel. She was staying out in Salem and then the conversation took place when we was enroute over here and in the district attorney's office here in Dallas, and on the way back.

Q Did you see Mrs. Wright again after that?

A Not that I recall.

Q Did she state anything, Mr. Howard, to you in regard to the condition of the stove than what you have related?

A No, sir.

Q She didn't tell in what particular the stove was out of repair?

A No.

Q Did she say anything about the door being propped up at any time?

A No, she didn't mention that to me.

Q And about the door being out of repair?

\* \* \* \* \* \* \* \* \* \*

Q (Mr. McKinney continuing.) Do you think of any other information she disclosed to you?

A No, sir.

Q Now, did she offer any more information in regard to the papers on the floor, where they were?

\* \* \* \* \* \* \* \* \* \*

A As I stated before, why, she said that she had been burning these papers and magazines over this period of time; she was packing and a considerable amount of them was still in the vicinity of the stove.

Q Did she tell you, Mr. Howard, where the fire started?

A She stated that she didn't see any blaze, but the fire seemed to be in the partition between the living room and the kitchen."

■ The purported statement of defendant to Officer Howard to the effect that defendant believed that she should write her own check for the amount of the insurance that she had had on the property and give it to Peterson applied to the matter of insurance from which defendant had received from the insurance company, the sum of $700.00. It could not be strained into an admission that defendant thought she was responsible for a fire causing a loss to plaintiffs conceded by defendant to be $2,000, and stated by plaintiffs' witness to be $7,000.00.

Taking this view, there remains only the purported statement of Officer Howard that defendant made an oral declaration to him

"that she felt that she was responsible for the

fire in a way because she had gotten up and built this fire in the heating stove and that there was considerable paper and magazines lying around the stove as she had been packing and cleaning up the house for several days and burning these papers but hadn't burned them all yet, and that it was possible that the door or the stove which wasn't in good repair had gotten open and some sparks had gotten out onto these papers.''

The description that Officer Howard stated defendant gave to him to the effect that there was no blaze to be seen and that the fire seemed to be burning in the partition between the living room and dining room, or the dining room and kitchen, dissipates the idea that the paper about the stove was burning, for, if it had been, certainly there would have been a visible blaze therefrom.

■ To hold that the question whether defendant's course in leaving paper on the floor in proximity to the heating stove was the proximate cause of the fire that consumed the dwelling house in suit would be to hold that the verdict might be founded only upon supposition, speculation and conjecture. This is not permissible. *Bridenstine v. Gerlinger Motor Car Co.,* 86 Or. 411, 426, 168 P. 972.

Conceding, without deciding, that the foregoing testimony of purported oral declarations of defendant could be construed as supporting the allegation that defendant permitted paper to be piled near to the heating stove and that might be held to be a negligent course of conduct, there is no testimony that the paper was ignited at the time the house was first found to be on fire; but, on the contrary, there was no blaze and only smoke and heat from the wall between the kitchen and the dining room or between the living room and the dining room.

Plaintiffs cite the case of *Kohanek v. Rudie Wilhelm Warehouse Co.*, 129 Or. 642, 276 P. 693, and the case of *Wilson v. Southern Pacific R. R. Co.*, 62 Cal. 164.

*Kohanek v. Rudie Wilhelm Warehouse Co.*, supra, presented the question whether there was sufficient evidence to require or permit the submission of the cause to the jury. The plaintiff alleged that plaintiff was operating his truck in a southeasterly direction along Larabee Street in Portland; that, at the same time defendant was operating a tractor truck and trailer along that street in the same direction; that the respective trucks were traveling at about the same rate of speed, and that, for a distance of 600 or 700 feet before the accident happened, the front end of plaintiff's truck was alongside of the defendant's trailer, while the tractor was at all times in front of plaintiff's truck. Plaintiff also alleged that when they had passed the intersection of Dixon and Larabee Streets the defendant suddenly and without notice or warning turned its tractor truck to the left and immediately in front of plaintiff and that plaintiff in order to avoid a collision with defendant's truck applied his brakes and brought his truck to a standstill. Plaintiff further alleges that at that time and place a streetcar was proceeding in a northwesterly direction upon the northerly tract of Larabee Street; that two-thirds of the length of the streetcar had passed plaintiff's truck when the defendant's truck struck the right front wheel of plaintiff's truck throwing it against the rear portion of the streetcar, with the result that plaintiff was thrown violently against the sides and floor of his truck and against the steering wheel thereof suffering severe personal injuries.

Dallas Whittle, one of defendant's truck drivers, denied that he was the operator of the truck that

indirectly caused the accident. The accident happened at 9:38 a. m. August 3, 1927. Defendant's said driver admitted that he was at the scene of the accident within a short time thereafter. The record disclosed that defendant's truck driver was operating a tractor truck hauling pipe of different sizes on the morning in question. Whittle said that he was loaded with about six tons of pipe at the Luckenbach Steamship Dock at about 9:00 o'clock a. m. and that in the front end of his truck he carried barrels.

A number of plaintiff's witnesses identified the truck involved in the collision as a truck loaded with pipes and boxes; and some stated that it was loaded with steel and boxes or barrels.

Upon the point at issue in the Kohanek case, no dependence was placed upon mere oral admissions, but direct testimony only was considered.

*Wilson v. Southern Pacific R. R. Co.* 62 Cal. 164, involved the destruction by fire of property belonging to plaintiff that had been stored in defendant's warehouse. We quote from the opinion of the Supreme Court of California in that case:

" * the evidence upon which the plaintiff rested went to show that the building, up to the time of the fire, had been used by the defendant as a warehouse and railroad depot, and was in charge of two employees of the defendant, one of whom was its local agent, and the other its warehouse-keeper. In the warehouse, cut off from the northern end of the building, there was adjoining the office and sitting-room of the railroad depot, a bed-room in which the keeper slept every night. The room was about fourteen feet square; its walls were constructed of upright redwood boards, about fourteen feet high, which were lined with cloth and paper. It was occupied with the bed and furniture of the keeper, and on the walls hung his clothes

and files of newspapers. On a shelf against one of the partition walls in the warehouse were kept several lamps trimmed and ready for use. On the evening of the fire, the local agent had left the warehouse in charge of the keeper, whose duty it was to 'shut up the doors of the warehouse and fasten it up for the night.' Having performed that duty, the keeper himself went to supper, and after supper returned to the warehouse. When he returned he went into the office, lit one of the lamps, took it into his bedroom and set it down on a little stand at the head of his bed, between the window and bed about three feet from the window. He remained while he changed his clothes, and dressed himself for the purpose of going out to visit some friends. Having finished his toilet, he locked up and left the warehouse.

What he did with the lighted lamp before leaving is thus stated by himself: 'After I had partially changed my clothing, I returned to the office and remained there perhaps half an hour or three quarters of an hours: * * * I think I extinguished my lamp and went away. * * * No lamp was burning when I left the depot. When I came out of the office into the sitting-room I turned down the lamp, blew it out, and set it on a little shelf within the office, to the left of the office door. * * * I looked at it, saw it was out, and left it.' About an hour or so after he had gone the warehouse was afire.

The first person to observe the fire was the proprietor of a hotel, situate about three hundred feet from the warehouse. Seated in the front office of the hotel, looking through the glass window of the door of the office, his attention was arrested by a sudden flash of light, which momentarily lighted up the warehouse and then went out, leaving the warehouse enveloped in smoke. Remarking to some one near him that the warehouse was afire, he ran out and gave the alarm. Those whom the fire alarm drew first to the burning building, discovered,

as they ran to it, the fire dropping from about the center of the warehouse, very near to the locality of the bedroom and office; and on reaching the spot, they kicked in the bedroom and office windows, and saw the office filled with smoke and the bedroom afire—the flames running up the partition walls and over the bed.''

■ The distinction between the instant case and the California case, above quoted, is obvious. In the case at bar, the plaintiffs rest their case of negligence and proximate cause upon a police officer's testimony of alleged oral declarations of defendant and these declarations merely are to the effect that defendant ''felt that she was responsible for the fire in a way.'' Testimony of oral admissions of a party should be viewed with caution. Section 2-1001, O. C. L. A., Vol. 1, p. 356.

■ Certainly, the testimony of witness Barbara Bindel, with reference to an incident that occurred two years before the fire in suit, and that of plaintiff, Mrs. Peterson, as to the result of her examination of the premises some two weeks or more before the fire, affords no basis upon which to find that the alleged negligence of defendant was the proximate cause of the fire.

In the California case, the testimony of the hotel proprietor and those who were first at the scene of the fire taken into consideration in the light of the testimony of the warehousekeeper, did not consist merely of purported oral statements, but only direct testimony given by eye witnesses. And that direct testimony very convincingly indicated that the fire originated from the lamp in the bedroom occupied by the warehousekeeper.

■ In the case at bar, the purported oral statements

of defendant to Officer Howard are plainly to the effect that the fire in the partition did not originate from the papers on the floor, and there is no other testimony in the record as to the origin of the fire.

We think that the trial court did not err in granting an involuntary nonsuit.

The judgment of the circuit court is affirmed.

BAILEY, J., concurs in the result.

HAY, J., did not participate in this opinion.